# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| KEVIN OLLIE | ) | CIVIL NO. 3:18-CV-02070 (KAD) |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| UNIVERSITY OF CONNECTICUT | ) | |
| Defendant. | ) | FEBRUARY 4, 2019 |

## MEMORANDUM OF DECISION RE:
## THE DEFENDANT'S MOTION TO DISMISS [ECF NO. 18]

Kari A. Dooley, United States District Judge

This action arises out of the events that unfolded following the termination of plaintiff Kevin Ollie ("Ollie") as the head coach of the men's basketball team at the defendant University of Connecticut ("UConn"). Ollie brings discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII") as well as the Connecticut Fair Employment Practices Act ("CFEPA"). He seeks preliminary injunctive relief and other equitable relief. By a motion dated December 27, 2018, UConn seeks dismissal of this action pursuant to Rule 12 of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction, failure to State a claim for which relief may be granted, and failure to join a necessary party. For the reasons set forth below, the Court grants UConn's motion to dismiss for lack of subject matter jurisdiction.[1]

---

[1] Because the Court concludes that it lacks subject matter jurisdiction over this case, it need not (and cannot) adjudicate the merits of UConn's alternative bases for dismissal. *See Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (noting that "[d]etermining the existence of subject matter jurisdiction is a threshold inquiry" because it implicates the authority of the court to adjudicate the dispute); *Can v. United States,* 14 F.3d 160, 162 n.1 (2d Cir. 1994) ("in most instances the question whether a court has subject-matter jurisdiction is, conventionally and properly, the first question a court is called on to consider.").

**Factual Allegations and Procedural Posture**

For purposes of this motion, the Court accepts the allegations in the Complaint as true and they are set forth as follows. Ollie was formerly employed as the head coach of the UConn men's basketball team. (Compl. at ¶ 8.) On March 10, 2018, Ollie was informed that he was being terminated. (*Id.* at ¶ 9.) On May 10, 2018, Ollie's union, the UConn Chapter of the American Association of University Professors (the "Union"), sent a letter to the president of UConn, in which it "raised issues of discrimination on [Ollie's] behalf." (*Id.* at ¶ 12.) On June 19, 2018, the president of UConn upheld Ollie's termination. (*Id.* at ¶ 15.) Thereafter, the Union filed a grievance on Ollie's behalf claiming that UConn terminated him without just cause in violation of the Union's collective bargaining agreement (the "CBA"). (*Id.* at ¶ 20.) The Union is currently arbitrating that grievance pursuant to Section 10 of the CBA. (*Id.* at ¶ 21.)

While the Union and UConn moved forward with the arbitration, Ollie sought to preserve his ability to pursue discrimination claims under the CFEPA and Title VII in an administrative or judicial forum. Because the CFEPA and Title VII have relatively short limitations periods — 180 days and 300 days, respectively — Ollie was concerned that the deadline for filing his discrimination claims would pass before the arbitration concluded. (*Id.* at ¶ 32.); *see also* Conn. Gen. Stat. § 46a–82(f) ("one hundred and eighty days after the alleged act of discrimination"); 42 U.S.C. § 2000e-5(e)(1) ("three hundred days after the alleged unlawful employment practice occurred"). Ollie was also concerned, however, that UConn would terminate the arbitration pursuant to the election-of-remedies provision in the CBA if he filed a discrimination claim with either the Connecticut Commission on Human Rights and Opportunities ("CHRO") or the United States Equal Employment Opportunities Commission ("EEOC") prior to the conclusion of the

2

arbitration. (Compl. at ¶ 34.) The election-of-remedies provision, set forth in Section 10.3 of the CBA, states:

> If prior to seeking resolution of a dispute by filing a grievance under this contract, or while the grievance proceeding is in progress, a member seeks to resolve the matter in any other forum, whether administrative or judicial, the [UConn] Board [of Trustees] shall have no obligation to entertain or proceed with this grievance procedure.

(*Id.* at ¶ 19.)

Accordingly, prior to filing a claim with the CHRO or EEOC, Ollie asked UConn, through counsel, whether it would agree not to invoke Section 10.3 if he filed a discrimination claim. (*Id.* at ¶¶ 34, 36.) Alternatively, he proposed entering into a tolling agreement concerning these claims. (*Id.* at ¶ 38.) UConn responded that it was "not willing to waive 10.3" and that it did not agree to the terms of Ollie's proposed tolling agreement.[2] (*See id.* at ¶¶ 40, 43.)

On December 17, 2018, Ollie instituted this action against UConn. Based upon the allegations set forth above, Ollie asserts that UConn has violated the CFEPA and Title VII in two ways. First, he alleges that, by refusing to agree that it will not invoke Section 10.3, UConn is, in effect, unlawfully "asserting the right to refuse to proceed with the grievance-arbitration process under the collective bargaining agreement if [Ollie] exercises his rights to file discrimination claims in an administrative agency or in a judicial forum." (*Id.* at ¶¶ 56, 72.) Second, Ollie alleges that by refusing to agree to his proposed tolling agreement, UConn is attempting to deter him from exercising his rights under the CFEPA and Title VII until the limitations period has lapsed. (*Id.* at ¶¶ 57–58, 73–74.) Ollie alleges that he has been harmed by this illegal conduct because, absent judicial intervention, he will lose either (a) his contractual right to arbitrate his grievance under the

---

[2] Ollie does not include the full terms of the proposed tolling agreement in the allegations in the Complaint.

3

CBA upon filing a claim with the CHRO or EEOC or (b) his statutory rights under the CFEPA and Title VII due to the passage of the limitations period. (*Id.* at ¶¶ 60–61, 76–77.)

With the Complaint, Ollie filed an *ex parte* request for a temporary restraining order and a preliminary injunction prohibiting UConn from invoking Section 10.3 if he files a claim with the CHRO or EEOC. He also sought (and still seeks) an order prospectively equitably tolling the applicable statute of limitations for his discrimination claims under the CFEPA and Title VII and equitably estopping UConn from asserting a statute of limitations defense to those claims. (*See id.*, Prayer for Relief, at ¶¶ 1–2.) The Court denied the request for a temporary restraining order under Rule 65(b) of the Federal Rules of Civil Procedure but convened a hearing on the request for a preliminary injunction on December 28, 2018. Prior to the hearing, UConn filed the instant motion to dismiss challenging, *inter alia,* this Court's subject matter jurisdiction on the ground that the claims asserted herein are not ripe for adjudication.

**Standard of Review**

Federal courts are courts of limited jurisdiction. Therefore, this Court must assure itself that it has subject matter jurisdiction as a threshold matter before proceeding to the merits of any case. *Wynn v. AC Rochester,* 273 F.3d 153, 157 (2d Cir. 2001). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). Ripeness, the issue raised by UConn, is a component of Article III standing; *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013); which in turn is an essential component of subject matter jurisdiction; *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) ("If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." [internal quotation marks omitted]). A plaintiff who seeks to invoke the authority of the court

bears the burden of establishing the court's subject matter jurisdiction by a preponderance of the evidence. *Makarova,* 201 F.3d at 113.

When a defendant raises a challenge to subject matter jurisdiction based on the allegations in the complaint, as UConn has, "the plaintiff has no evidentiary burden" and the court must ordinarily decide the issue based solely on the allegations in the complaint and the exhibits attached thereto. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). The complaint in this case, however, references and relies upon a series of e-mails between counsel for both parties. The e-mails were not attached to the complaint but were appended to Ollie's subsequent pleadings, including his memorandum in opposition to the instant motion to dismiss. The e-mails include Ollie's request that UConn either waive Section 10.3 if he files a claim with the EEOC or CHRO, or, alternatively, enter into a tolling agreement with respect to his discrimination claims. The e-mails also include UConn's response to these inquiries. Neither party has raised any challenge to the authenticity of the e-mails or objected to the Court's consideration of them. Indeed, both parties have relied upon the e-mails in their arguments regarding the motion to dismiss. In addition, the Court concludes that the communications reflected in the e-mails are "integral" to the complaint and may be fairly considered on a motion to dismiss even though they are not attached to the complaint. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (discussing standard for consideration of documents that are "integral" to the complaint at the motion to dismiss stage).

**Legal Standard**

"To be justiciable, a cause of action must be ripe—it must present a real, substantial controversy, not a mere hypothetical question. Ripeness is peculiarly a question of timing. A claim is not ripe if it depends upon contingent future events that may not occur as anticipated, or indeed may not occur at all. The doctrine's major purpose is to prevent the courts, through

avoidance of premature adjudication, from entangling themselves in abstract disagreements. The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Org. for Marriage, Inc.*, 714 F.3d at 687 (citations omitted; internal quotation marks omitted). The ripeness requirement "prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it." *Id.* at 688 (quoting *Simmonds v. INS,* 326 F.3d 351, 357 (2d Cir. 2003)).

Here, UConn argues that Ollie's claims are unripe under Article III of the United States Constitution. "Often, the best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing. The irreducible constitutional minimum of standing contains three elements: (1) 'the plaintiff must have suffered an injury in fact,' i.e., 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical'; (2) 'there must be a causal connection between the injury and the conduct complained of'; and (3) 'it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.' *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (quotation marks, citations, alterations, and footnotes omitted). Constitutional ripeness, in other words, turns on the first *Lujan* factor—to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not actual or imminent, but instead conjectural or hypothetical." *Nat'l Org. for Marriage, Inc.*, 714 F.3d at 688 (citations omitted; footnote omitted; internal quotation marks omitted).

**Discussion**

UConn urges dismissal of this action because Ollie's claims do not present a real or substantial controversy insofar as Ollie has not suffered an actual or imminent injury. There is no

6

"injury in fact," UConn argues, because it is undisputed that Ollie has not filed a claim with the CHRO or the EEOC and, therefore, UConn has not had to decide whether it can or should invoke Section 10.3. Nor is there an imminent risk of harm because UConn has not threatened to invoke Section 10.3 if Ollie decides to file a claim with the CHRO or the EEOC. UConn has merely indicated that it will not, anticipatorily, waive Section 10.3. Accordingly, UConn argues, Ollie's claimed injuries are hypothetical; based on a series of events which have not, and might never, come to pass.

In response, Ollie articulates three distinct bases under which his Title VII claim[3] is ripe for adjudication. Ollie first asserts that UConn's refusal to agree not to invoke Section 10.3 has deterred, or "chilled," him from filing a claim with the EEOC and that chilling effect constitutes a sufficiently concrete and particularized injury to confer standing. Second, Ollie argues that there is a "credible threat" that UConn will invoke Section 10.3 if he files a claim with the EEOC. This "credible threat," he argues, has resulted in "coerced self-censorship" (*i.e.*, not filing a claim with the EEOC) sufficient to confer standing. Finally, Ollie asserted in his Complaint that he has suffered an actual or imminent injury under the first *Lujan* factor due to (a) the lapse of the limitations period for his Title VII claim as a result of UConn's refusal to waive its rights under Section 10.3 or (b) his risk of losing his contractual right to arbitrate his grievance if he files a claim with the EEOC. (Compl. at ¶¶ 60–61.) Ollie's arguments are addressed *seriatum.*

Ollie first argues that UConn's conduct has "chilled" his exercise of his Title VII rights and that chilling is a sufficient injury to confer standing. His argument derives from a series of

---

[3] Ollie did not separately address whether his CFEPA claim is ripe for adjudication because he concluded that this Court has jurisdiction over the CFEPA claim only if it has jurisdiction over the Title VII claim. The Court agrees. *See Jackson v. Post Univ., Inc.*, 836 F. Supp. 2d 65, 68 (D. Conn. 2011) (noting that CFEPA claim is one over which the court has supplemental jurisdiction); *see also* 28 U.S.C. § 1367 (setting forth legal standard for exercise of supplemental jurisdiction).

7

cases involving pre-enforcement challenges to statutes or regulations based on the First Amendment to the United States Constitution. In these cases, plaintiffs have been held to have standing to bring First Amendment challenges to laws prior to their actual or threatened enforcement based on the chilling effect the law has on their protected speech. *E.g., Nat'l Org. for Marriage, Inc.*, 714 F.3d at 687, 690 (holding plaintiff had constitutional standing to challenge statute where plaintiff "plausibly contends" it was regulated by that statute even though plaintiff had not attempted to ascertain its status vis-à-vis the statute nor had it been subject to any enforcement action); *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 381–84 (2d Cir. 2000) (holding non-profit had constitutional standing to seek declaratory judgment and injunction concerning state statute regulating political advertisements based on reasonable belief that some of its advertisements fell within the challenged provisions even though it had not yet been charged with a violation). Courts have found standing in these cases because "without the possibility of pre-enforcement challenges, plaintiffs contesting statutes or regulations on First Amendment grounds face an unattractive set of options . . . : refraining from activity they believe the First Amendment protects, or risk civil or criminal penalties for violating the challenged law." *Nat'l Org. for Marriage, Inc.*, 714 F.3d at 689 (quoting *Fla. League of Prof'l Lobbyists, Inc. v. Meggs,* 87 F.3d 457, 459 (11th Cir. 1996)) (internal quotation marks omitted); *see also Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'"). As a result, pre-enforcement claims brought under the First Amendment are viewed "under somewhat relaxed standing and ripeness rules." *Nat'l Org. for Marriage, Inc.*, 714 F.3d at 689.

Ollie argues that the chilling doctrine as discussed in this line of cases is applicable here. Specifically, he maintains that UConn's refusal to waive its rights under Section 10.3, which he equates with a threat to invoke Section 10.3, has resulted in him being forced to choose between exercising his rights under Title VII on the one hand and exercising his contractual right to arbitrate his grievance on the other. As a result, Ollie contends UConn has chilled him from exercising his rights under Title VII in the same way an unconstitutional statute might chill a plaintiff from exercising his First Amendment rights.

The Court disagrees. The chilling doctrine arose as a specific solution to a problem presented in the First Amendment context. The freedoms afforded by the First Amendment have long been regarded not only "as supremely precious in our society" but also "delicate and vulnerable." *N.A.A.C.P. v. Button*, 371 U.S. 415, 433 (1963). As a result, it is now well established that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972) (collecting cases); *see also Nat'l Org. for Marriage, Inc.*, 714 F.3d at 689. This rule comes from the Supreme Court's recognition that "[t]he threat of sanctions may deter [the] exercise [of First Amendment rights] almost as potently as the actual application of sanctions." *Button*, 371 U.S. at 433.

Ollie has not cited, and this Court has not located, any case in which a court has applied the chilling doctrine of standing outside of the context of the First Amendment. In fact, courts have repeatedly declined to apply the chilling doctrine outside of the limited context of free speech and free expression claims under the First Amendment. *United States v. Chester*, 628 F.3d 673, 688 (4th Cir. 2010) (concluding importing this "'extraordinary' exception . . . into the Second Amendment context would be inappropriate" because the overbreadth, or "chilling effect,"

doctrine "is the Court's solution to [a] speech-specific problem"); *Coleman v. DeWitt*, 282 F.3d 908, 914 (6th Cir. 2002) (declining to apply overbreadth and related chilling of rights doctrine in context of substantive due process claim); *Grendell v. Ohio Supreme Court,* 252 F.3d 828, 834 (6th Cir. 2001) ("It is well-settled that facial constitutional challenges relying on the overbreadth doctrine, and the resultant chilling effect such overbreadth has on speech, are limited to the First Amendment sphere."); *Firearm Owners Against Crime v. City of Harrisburg*, No. 1:15-cv-0322, 2016 WL 1162283, at *6 (M.D. Pa. Mar. 24, 2016) (declining to apply chilling doctrine to Second Amendment claim where "[p]laintiffs offer no legal support for application of the concept of 'chilling effect' from First Amendment jurisprudence to the instant case"); *Nat'l Conf. of Catholic Bishops v. Bell*, 490 F. Supp. 734, 741 (D.D.C. 1980) (declining to apply chilling doctrine in context of free exercise claim under the First Amendment), *aff'd* 653 F.2d 535 (D.C. Cir. 1981) (per curiam).

In addition, in the First Amendment cases, "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Laird*, 408 U.S. at 11. That is, the plaintiffs had a real and imminent fear of being subjected to civil or criminal penalties if they engaged in the speech that they believed to be protected. This is not the kind of dilemma Ollie faces. Unlike the plaintiffs in the First Amendment cases, Ollie does not have to break the law (or even the CBA) in order to pursue his Title VII claims. Indeed, he still has all of the rights and remedies he needs for his discrimination claims available to him under Title VII. As such, the concerns identified in the First Amendment cases are simply not implicated in this case and the Court declines to apply the chilling doctrine of standing to the circumstances presented here.

Ollie next argues that his claim is ripe for adjudication based on what he terms the coercive nature of UConn's conduct. This argument is based primarily on the Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007). Although similar to the chilling doctrine jurisprudence, *MedImmune* provides a distinct analysis of Article III ripeness in the context of the Declaratory Judgment Act.

There, MedImmune, a drug manufacturer, disputed whether it was required to pay certain patent-related fees to the defendant, Genentech, under the parties' licensing agreement. *Id.* at 121–22. When Genentech sent a letter threatening to enforce its patent, terminate the licensing agreement and bring suit, MedImmune started paying the disputed fees and instituted a declaratory judgment action challenging the validity and enforceability of Genentech's patent. *Id.* Importantly, had MedImmune not paid the disputed fees and Genentech prevailed in its threatened patent suit, MedImmune could have been liable for treble damages and attorney fees and enjoined from selling a product that made up eighty percent of its sales revenue. *Id.* at 122. During litigation of the declaratory judgment action, an issue arose as to whether there was an actual controversy in light MedImmune's payment of the disputed fees. The lower courts concluded that there was no case or controversy because MedImmune's payment of the disputed fees eliminated any threat of imminent harm. *MedImmune, Inc. v. Genentech, Inc.*, 427 F.3d 958, 962–63 (Fed. Cir. 2005). That is, because the payments were being made, MedImmune was not at risk of being sued, being found liable for treble damages, or enjoined from making sales of the product at issue.

On appeal, the Supreme Court began by observing that "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat — for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc.*, 549 U.S. at 128–29; *e.g., Terrace v. Thompson,* 263 U.S. 197,

11

211–212, 216 (1923) (holding plaintiff was not required to bet the proverbial farm to challenge constitutionality of Anti-Alien Land Law where State threatened forfeiture of plaintiff's farm, fines, and penalties if he entered into a lease with an alien); *Steffle v. Thompson,* 415 U.S. 455–56, 459 (1974) (holding there was an actual controversy for declaratory judgment action challenging constitutionality of criminal trespass statute where plaintiff "has been twice warned to stop" distributing handbills challenging Vietnam War "and has been told by the police that if he again distributes handbills at the shopping center and disobeys a warning to stop he will likely be prosecuted."). "In each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do," but the Supreme Court nonetheless concluded that the court had jurisdiction "because the threat-eliminating behavior was effectively coerced." *MedImmune, Inc.*, 549 U.S. at 129. The Supreme Court further observed: "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Id.*

The question, therefore, was whether this coercion theory of standing had applicability in private disputes. The Supreme Court concluded that it did, reasoning that actual or threatened injury to a business by a private actor can be as coercive as actual or threatened injury by a governmental actor. *Id.* at 131, 134; *see also id.* at 132 (reiterating its observation in an earlier case that "'[t]o imperil a man's livelihood, his business enterprises, or his solvency, [was] ordinarily quite as coercive' as, for example, 'detaining his property.'"). Harkening back to the cases previously discussed in the opinion, the Supreme Court held: "The rule that a plaintiff must destroy a large building,[4] bet the farm, or (as here) risk treble damages and the loss of 80 percent

---

[4] The case the Supreme Court is alluding to with this remark is *Willing v. Chicago Auditorium Assn*, 227 U.S. 274 (1928). There, the plaintiff-lessee sought judicial clarification concerning whether it could demolish an antiquated

of its business before seeking a declaration of its actively contested legal rights finds no support in Article III." *Id.* at 134.

Ollie contends that this case is analogous to *MedImmune* because he is being asked to "bet the farm" — *i.e.*, his contractual right to arbitrate his termination — in order to pursue his statutory rights under Title VII. As an initial matter, Ollie is not seeking a declaratory judgment under the Declaratory Judgment Act. He seeks equitable and preliminary injunctive relief to safeguard his claims under the CFEPA and Title VII. The *MedImmune* decision was decided entirely within the context of a declaratory judgment and, therefore, it is unclear whether *MedImmune* has application outside of that context.

Assuming, without deciding, that *MedImmune* applies outside of the declaratory judgment context, it is inapposite. UConn has not threatened to sue Ollie or to terminate the arbitration if Ollie files a discrimination claim with the EEOC. UConn has stated only that it is "not willing to waive [Section] 10.3."[5] Ollie contends that this is a distinction without a difference, arguing that by refusing to stipulate that it will not invoke Section 10.3 UConn is affirmatively "asserting the right to refuse to proceed with the grievance-arbitration process under the collective bargaining agreement if [Ollie] exercises his rights to file discrimination claims in an administrative agency

---

auditorium and replace it with a new commercial building prior to commencing construction under the terms of its lease agreement. *Id.* at 285–87. Importantly, this dispute arose prior to the enactment of the Declaratory Judgement Act. Accordingly, the Supreme Court concluded that there was no case or controversy because the plaintiff had not been wronged or threatened yet. *Id.* at 288. Instead, it observed: "What the plaintiff seeks is simply a declaratory judgment. To grant that relief is beyond the power conferred upon the federal judiciary." *Id.* at 289. Had *Willing* been decided after the enactment of the Declaratory Judgment Act, the *MedImmune* Court was "confident a different result would have been obtained." *MedImmune, Inc.*, 549 U.S. 134.

[5] Ollie also relies upon UConn's "history of invoking Section 10.3" to support his argument and cites to a single instance in which UConn has previously invoked Section 10.3. First, Ollie does not allege in his complaint that UConn has a history of invoking Section 10.3 and, accordingly, the Court need not consider this assertion. Second, even if properly considered, the fact that UConn may have invoked its rights under Section 10.3 on a prior occasion, with respect to a different arbitration involving a different employee and under circumstances unknown to the Court, has no bearing on the Court's analysis of whether UConn has invoked or threatened to invoke Section 10.3 in this case, which is the salient question under *MedImmune*.

or in a judicial forum."[6] (Compl. at ¶¶ 56, 72.) While Ollie might not recognize the distinction, this Court must. This Court should not and cannot speculate as to the myriad of considerations UConn might undertake when determining how to respond to any claim Ollie might (or might not) file with an administrative agency or court. Whether and how UConn might choose to exercise its rights is simply unknown at this juncture.[7] Critical to the outcome in *MedImmune* and the cases cited therein, was the actual threat made against the plaintiffs and the significant harms that could flow therefrom. Absent any actual threat by UConn, *MedImmune* is unavailing.

Moreover, the "worst case scenario" faced by Ollie is that he loses the ability to arbitrate his termination, a forum he prefers insofar as UConn bears the burden of proof there. This is ultimately the basis for his argument that he is being asked to "bet the farm." However, even if this worst-case scenario was to come to pass, Ollie is not without recourse because he still has the ability to challenge his termination in another forum. In a forum other than the arbitration, Ollie would bear the burden of proof, but this situation does not approach the dire Hobson's Choice faced by the plaintiff in *MedImmune*.

Lastly, the Court looks to whether Ollie has standing under the traditional standing analysis set forth in the first *Lujan* factor. Ollie contends in his complaint that he has suffered real or imminent harm because UConn's conduct, which he claims violates Title VII, has caused the limitations period for some of his discrimination claims to lapse. (Compl. at ¶ 60.) He also asserts as a real or imminent harm based on the potential loss of his arbitration rights under the CBA if

---

[6] The Court recognizes that Ollie alleges in his complaint that UConn has maintained that it will terminate the arbitration if he files a discrimination claim with an administrative agency or the court. (Compl. at ¶ 2.) Notwithstanding that allegation, it is readily apparent from the e-mail correspondence provided by Ollie and the representations of both counsel during the litigation that UConn has not affirmatively stated that it will invoke Section 10.3 if Ollie files a discrimination claim with an administrative agency or the court.

[7] For example, if UConn decides to withdraw from the arbitration, citing Section 10.3, Ollie might challenge that action as violative of Title VII (as he has done in this proceeding) or on some other ground. It is not for this Court to speculate further as to the outcome of such a challenge.

UConn invokes Section 10.3 after he files a discrimination claim with the EEOC. (*Id.* at 61.) These harms are both conjectural and hypothetical at this stage and cannot therefore provide a basis upon which Ollie has standing or this Court has subject matter jurisdiction.

The passage of a limitations period does not in and of itself bar Ollie's claims because the limitations period under Title VII is not jurisdictional. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393 (1982). Instead, "[t]he statute of limitations is normally an affirmative defense on which the defendant has the burden of proof." *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004) (citation omitted); *accord McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010); *Nghiem v. U.S. Dep't of Veterans Affairs*, 451 F. Supp. 2d 599, 603 (S.D.N.Y. 2006), *aff'd*, 323 Fed. Appx. 16 (2d Cir. 2009). Consequently, for Ollie to suffer an actual injury based on the passage of the limitations period, he must first file a claim with the EEOC, UConn must then assert the limitations period as an affirmative defense, and UConn must prevail in that defense. A statute of limitations defense, of course, is "subject to waiver, estoppel, and equitable tolling." *Zipes*, 455 U.S. at 393. Accordingly, Ollie can challenge this defense by, for example, requesting that the limitations period be equitably tolled or that UConn equitably estopped from asserting this defense (as he has requested in this proceeding). Because any harm related to the passage of the limitations period is contingent on future events that might never come to pass, it is conjectural, hypothetical, and inadequate to establish standing.

Similarly, any injury based on the termination of the arbitration by UConn is hypothetical at this stage. UConn has only asserted that it is "not willing to waive [Section] 10.3." If Ollie files a claim with the EEOC, it is unknown and speculative whether UConn will actually invoke Section 10.3. Accordingly, UConn's refusal to waive its rights under the CBA does not cause a real or imminent injury to Ollie and therefore it does not create an issue that is ripe for adjudication.

In concluding that Ollie's claims are not ripe for adjudication at this stage, the Court makes no determination as to the merits of his claims. The Court is deciding only that it is premature to decide the issues presented in Ollie's complaint because the injury or harm he identifies might never come to pass. If the events portended by Ollie come to pass, Ollie will have the opportunity to raise all of his claims and defenses in due course and in whichever forum he finds himself. His effort to litigate those claims and defenses on a pre-emptive basis through this action, however, fails for the reasons set forth above.

**Conclusion**

For all of the foregoing reasons, the motion to dismiss is GRANTED.

**SO ORDERED** at Bridgeport, Connecticut, this 4th day of February 2019.

/s/
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE